All rise. The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States. Good morning. Please have a seat. We have a full day in front of us today. We have had, we're going to hear four cases on oral argument. We're deciding two cases on the briefs. Our first case this morning is Hillcrest Laboratories, Inc. v. Movea, Inc. Mr. Barney, and I understand you're reserving five minutes for rebuttal. Yes, Your Honor. All right. Including support for Mr. Barney on behalf of Hillcrest Labs, there are two claim construction issues on appeal. And I'd like to begin with what is perhaps the easier of the two, and that is the rotational outputs limitation. The reason I believe that is the easier of the two is that the parties actually agree on the correct claim construction of this term. They also agree, or at least there appears to be no dispute, that the board's analysis of this limitation was erroneous. So the only question is whether there is an alternative ground for affirmance that this court can reach, and we believe the answer is no. Every claim at issue in this appeal requires a tilt compensation equation that has three inputs. Tilt is denoted as theta, a first rotational output, alpha y, and a second rotational output, alpha z. The parties on appeal have agreed that rotational output, as properly construed, is the sample output of a rotational sensor, such as a gyroscope. So these claims require two rotational sensors that measure rotation about the y and the z-axis, and using the nomenclature of the Liberty patent, that corresponds to horizontal and vertical movements of the cursor on the screen. Now the board mapped the equation in column 21 of E-Day, which is the prior art reference that's at issue here, to the claimed equations in the Liberty patent. In doing so, it acknowledged that the horizontal and vertical components of that equation in E-Day are derived from linear sensor outputs, not rotational sensor outputs. Again, Movia does not dispute that the board's analysis in that regard was incorrect, because as the parties now agree, rotational outputs means the output of a rotational sensor, not a linear sensor. So Movia is not defending that rationale on appeal. Instead, what it's doing is arguing that the board's judgment, although it includes an error in the analysis, can nevertheless be affirmed on alternative grounds. Specifically, Movia contends that E-Day teaches, as an alternative, the use of rotational sensor outputs as inputs to the equation in column 21 of E-Day. We disagree that E-Day discloses that. There is only one rotation compensation equation in E-Day, and that's in column 21. It corresponds to a fourth embodiment of E-Day. That's the embodiment that the examiner and the board relied on in rejecting the claims. There are no other compensation equations anywhere else in E-Day. And as the board correctly found, that compensation equation in column 21 of E-Day is based on linear sensor outputs, not rotational sensor outputs. And again, Movia is not attempting to defend that erroneous rationale. So we believe that there is a factual dispute here about whether or not E-Day actually discloses that. But what's important is there are no factual findings in the record that would support Movia's alternative argument that it's making on appeal. As I said, it's undisputed that the board relied on linear sensor outputs when it mapped E-Day's equation to the claim compensation equation. And so you won't find any factual findings in that portion of the board's opinion that support the alternative theory being presented by Movia. So what Movia is pointing to for its factual support is the board's anticipation findings for two dependent claims, dependent claims 6 and 17. And it tries to bootstrap, Movia tries to bootstrap from these findings a more granular finding regarding the use of rotation sensors in E-Day's compensation equation. The problem is, and this is all in the briefs, the problem is when you look at the limitations that are actually added in those dependent claims, they don't recite the use of two rotation sensor outputs as the inputs to a compensation equation. And so you can't infer anything about that limitation from the board's finding on the two dependent claims. I found this case complex. And to be honest, the briefing didn't help much. Let me ask you, how do the claims treat inertial frame of reference? How is that different from user's frame of reference? Sure, Your Honor. That's a different limitation, but I'm happy to turn to that now. Let's go to that one. I wanted to start with the rotation one, by the way, just because I think it's a simpler issue. They're asking for an alternative ground for affirmance. There are no facts to support that alternative ground. It requires a remand. I'm happy to turn to the other limitations. So Liberty teaches rotating measured movements into two different types of frames of reference, a user frame of reference or an inertial frame of reference. And as Your Honor put your finger on, the dispute between the parties here on appeal is whether there's a difference between those two. And if so, whether the board's construction of inertial frame of reference actually captures that distinction. Now, the board construed or adopted the construction of inertial frame of reference that Mavia argued in its petition, which is a frame of reference associated with a squeeze orientation. Now, Mavia has put forth a new construction on appeal that it didn't argue below. But this court is being asked to review the construction that the board actually adopted and used in its projections. And that construction was a frame of reference associated with a squeeze orientation. The problem we have with that construction is that it gives no meaning to the word inertial. It's really just the same construction that would apply to a user's frame of reference. And in fact, the board's construction, if you look at the wording of it, comes almost verbatim from a description in the Liberty patent of an example of a user's frame of reference. And I would refer the court to appendix 47, column 16, lines 28 through 30. Now, the board disagreed with our argument and said that its construction does give sufficient meaning to the word inertial. And this was the board's rationale. According to the board, if you have a screen that's oriented vertically, a wall or sitting on a desk, and then if you associate the frame of reference of the device with that screen, well, now the device's frame of reference will be associated with a frame of reference that is oriented according to gravity, and therefore the device's frame of reference will also be inertial. That's the board's logic. That was also the logic of the examiner. There is a flaw in that logic. And the key word, and what I believe is the heart of the board's error, is the word associated, which is, by the way, a word that Nivea seems to forget about in its brief. In E-Day, which is the prior art that we're arguing about here today, it is the user who associates the device with the screen. And he does so by looking at the screen's orientation and essentially mimicking that orientation in the handheld device. That's what the illustrations in E-Day are showing. You either orient it with a laptop that's tilted backwards, or you orient it with a screen that may or may not be sitting on a flat table. But regardless of how you do it, it's a manual process. Why? Because the device in E-Day cannot sense the screen. The device in E-Day has no idea what the orientation of the screen is. Moreover, the device in E-Day doesn't know its own orientation relative to the screen. As far as the device in E-Day is concerned, the screen doesn't exist. It can't see it, it can't sense it, and it doesn't know its orientation relative to that screen. So the only way that you can, quote, associate the frame of reference of the device with the screen is to do it manually, which is exactly what E-Day teaches. So your opponents argue that the proper frame of reference is the earth frame. That's what they're arguing on appeal. It's not exactly what they argued below. It's a new construction. Did you make that argument at all below? The claim construction they proposed below was the one the court adopted, the board adopted, which is a frame of reference associated with a screen. The new argument they've presented here still is incorrect because they're presenting it in a way that would still allow a, quote, inertial frame of reference to be defined completely by a user with no sensing of any external field such as gravity, which is exactly what E-Day teaches. And the problem with that type of frame of reference, I mean, I say it's a problem. I would say a feature of that type of frame of reference is that because the device doesn't know its own orientation relevant to the screen, if the user gets it a little bit wrong, which is often the case because it's very difficult to manually align something to a screen that is 15 or 20 feet away. And so if the user is off by maybe two or three degrees when he sets that frame of reference, the device isn't going to know that. The device is going to assume that that is the correct frame of reference for the screen. And then thereafter, every movement of the user will be a little bit off. Does the device know that the display unit is substantially aligned with gravity? No, it does not, Your Honor. The device in E-Day only has a rotational sensor. And a rotational sensor is a relative sensor. All it can detect is the relative rotation of the device. It can tell that it's moving clockwise. It can tell it's moving counterclockwise. And you can do some calculations to figure out how far it's moved. But it has no idea what gravity it is. But yet the figures, figure 33, 35A, 35B in E-Day, they all show what's clearly displays that are aligned with gravity. I mean, they're vertical. They're all vertical. Your Honor, this gets to the inherency argument, and I will grant you that that is one potential interpretation of that page. But I think the more salient argument is even if we assume they're vertical, even if I grant you that those screens are vertical, that doesn't mean that a user who's standing 20 feet away and manually aligning the device with the screen is holding the device vertical. That's where the inherency comes in. The examiner assumed that the user is going to perfectly align that device with gravity simply because he's eyeballing it to a screen that may itself be aligned to gravity. But we're getting back to this idea of inertial frame of reference. The Liberty patent acknowledges what E-Day uses as a frame of reference, and the Liberty patent calls that a user's frame of reference because the user defines it. It's not based on anything that's sensed outside of the device itself. And he also uses a different frame of reference called an inertial frame of reference, and the patent treats those two frames of reference distinctly. They never are equated in the patent. They're never said to be synonymous with each other. This court's precedent requires that terms that are used, different terms that are used in the claims and in the specification are presumed to have different meanings and must prove otherwise. Here, there's no proof that they were used to have same meanings. I'm still confused. I mean, how would, what's the point of having a different, the inertial frame of reference be a different frame of reference than the user frame of reference? I mean, you don't want the device to have a frame of reference that's different than what's on the screen because then it's not showing on the screen properly. Your Honor, the difference is that an inertial frame of reference is only going to work when you're dealing with a screen that is aligned to the same inertial field that you're using. So it's a more limited example. That's why the patent talks about an inertial frame. You mean when it's up and down for understanding? Right. Whereas in what universe on this planet would you have any other kind of reference than one that's going up and down? Well, Your Honor, a user's frame of reference can be any frame of reference. So if you had a screen that was not oriented vertically, you could create your own user frame of reference that is oriented to that screen instead of one that is straight in front of you. Or if you're laying on your side and you're too lazy to sit up and move the cursor this way, you could define a frame of reference where you can move it while you're on your side and the frame of reference will understand that when you do that, what you're really intending to do is this. That's what a user frame of reference can do for you. The patent describes an inertial frame of reference and the techniques for rotating into an inertial frame of reference as a subset of a broader set of techniques for translating into a user's frame of reference, which proves that it's a different scope. They're not equated. Okay, you're into your rebuttal time. Thank you, Your Honor. We'll restore you back to four minutes. Thank you. Yeah, four. If I may please the court, I'm here. Yeah, I'm appearing here on behalf of NVIDIA. If I may, I'd like to start out by addressing one of the more recent points that were made by my colleague for Hillcrest, and this is the concept of eyeballing the frame of reference. That's an argument that Hillcrest is very fond of making, and the examiner disagreed with it, the board disagreed with it, and if you read E-Day clearly, it shoots down that argument. What Hillcrest does is they cite from column 20 of E-Day, which is describing the problem that you would have if you're not perfectly aligned. This is at column 20, beginning of line 45. The appendix page. That's appendix page 760. I'm sorry, 76? 760. So that's talking about the problem. Where at? Sure, beginning of line 45. Which column? Column 20. Okay. So there's a paragraph that begins figures 28A to 28D. Then it goes on to say, the cursor moves in a different direction from his hands' movement in space unless the operator holds the mouse so that the horizontal and vertical directions of the mouse may correspond to the horizontal and vertical directions of the screen. So that's describing what may happen if you're not perfectly aligned. And that's what Hillcrest cites. If you continue on to column 21, and this is a very important point, beginning at line 10, on the next page, 761, that's the appendix. If you continue reading at column 21, beginning at line 10, E-Day, the prior argument says, to overcome this problem, it then talks about using the rotation amount sensing element to figure out how much of a difference in rotation is there. But I think what your friend is arguing is that that still doesn't do what their patent does, which is automatically hook up the device with the inertial frame of reference, you know, based on gravity, that you first, under E-Day, still have to have it set manually to say this is the frame of reference, and then all it does is, once you've got it set, controls for rotation. Now, I mean, this... I have the same concerns that my colleague does. This case is bafflingly complex, and I think you've both done a not very good idea of explaining the technology. And it's not all that complicated of technology. It's pointers that operate not on the table, but in space. But from this, I don't get why this is saying that it doesn't do what he says, although I also could agree with you that it does do. I just thought, where are we with this? It's... E-Day is solving the same problem, which is when there's a mismatch between what the user intends and what shows up on the screen. And so it's solving that same problem, and it's doing it by figuring out, okay, how much of an error is there? But what state does it calculate that error from? It calculates it. Well, the examiner... Let me give you one more try. I have no idea whether this is right, because it's complicated, and I hear two different explanations. But it seems to me that your friend is saying, our device, you don't have to do kind of anything. It just automatically hooks up with the screen and recognizes that the screen is in a certain rotation and does it, and then controls for the rotation thereafter. It seems like they're saying E-Day doesn't do that. At first, you have to kind of... The user has to manually set and say, here's the cursor at a certain thing, and all it does is correct afterwards. Does... Do you understand what I... Sure. If I can address the manual setting part. E-Day discloses two different inventions. One is the cursor control, which is what's relevant to here. E-Day also discloses something completely irrelevant to us, which is a pattern input, a gesture input, where you can move your hand in a certain pattern, and it detects that pattern. That button in E-Day is to switch from one mode to the other. It's not for saying, okay, I am now setting my frame. This is the frame that I want. It's just telling the device I'm switching from one mode to the other. So back to your point of how does E-Day know what that offset is. Yeah. And there's two responses to that. One is E-Day mentions that the problem is that there's an offset, that there's a rotational offset. And so to solve that, E-Day discloses using a rotation amount sensing element. E-Day never describes the specific technology for implementing that. And in the reexamination, the examiner agreed that it would either be inherent to use an accelerometer, because that was something very well known at the time for determining that. And an accelerometer is something that can determine how much you've shifted relative to the gravity axis. So that's what the examiner found. Does that answer the question hopefully a little bit better? Well, you said the examiner found that. And I do see where the examiner found that E-Day could at least inherently disclose an accelerometer. I didn't see the board necessarily relying on that. Well, the board actually did agree with that. And what the examiner found was that E-Day just discloses the rotation amount sensing element without giving a specific piece of hardware to do it. And the examiner also found that E-Day never really precluded any particular element. And the examiner also found, based on the evidence that was presented and her analysis of it, that it would be inherent to use an accelerometer. That's something that was very well known to a person of ordinary skill at the time for sensing these types of things. And there was a secondary reference that was submitted on EDX, I think analog devices data sheet, which disclosed that an accelerometer used for this particular type of application. So either it was inherent or it's E-Day plus a combination of the well-known accelerometer. Back to, I really want to talk about this rotational output issue. If you look at the board's decision, this is in the appendix, page 11 to 12. It's kind of confusing because it's page 10 of the board's decision, but it ends up at page 11 of the appendix. The paragraph that ends at the bottom of the page, in order to define error. So there, the board is addressing this issue of, does E-Day provide a linear output or does it provide a rotational type of output? And the board starts out by discussing what the examiner found. And they say, you know, nor do we find error in the examiner's mapping of these values to the recited rotational outputs, because these outputs depend on the rotational shift, which is the theta m. And so they say they are rotational in that sense. The next sentence, you have to read very carefully. They say, this is the board, we reach this conclusion despite the value of x prime and y prime representing linear movements as patent owner contends. So yes, they use the word linear, but they're talking about what the patent owner contended. And if you go back and look at what the examiner had said, which the board was reviewing here, the examiner was very clear that she said that E-Day discloses rotational outputs because it's a shift in the angle. And what the examiner said is at page 838 in the appendix. Towards the bottom of the page, about three, four lines up. This is in the array of appeal notes. The examiner says that x prime and y prime depend on the angle, et cetera, theta m. Consequently, they are rotational outputs. And to support that, if you read E-Day, E-Day talks about using piezoelectric gyroscopes to sense the rotation. And also says that those elements can determine angular velocity. And angular velocity is a concept of rotation. How much of your speed as you're moving along a circle, as opposed to a linear movement. So what we have here is the board reviewing what the examiner said, and the examiner said these are rotational outputs because E-Day discloses them that way. E-Day talks about sensing angular velocity. And the board then says, you know, we reached the same conclusion, despite patent owner contending that these are linear movements. Let me take you back to the construction of inertial frame of reference. Yes. In your brief, you say it's clear that the PTO understood inertial frame to mean a frame that is fixed relative to the earth frame. And this argument that you're making, which is pretty lengthy in your brief, addresses the issue whether the board explicitly identified the frame that it believes is relative to the inertial frame. In your response, your argument is that it doesn't matter because it's clear that the board was referencing to a frame that is fixed relative to the earth frame. Where in the decision is the term earth frame used? The term itself, earth frame, is not used. But what is used in the board's decision when they arrived at that claim in the construction, they did address the concept of inertial. And they said that, you know, the frame of reference, they defined that the inertial frame is associated with the screen orientation. Well, I get that. It just makes me uneasy when I see pages of argument that are based on a premise that, as you're pointing out now, just doesn't exist. This statement is incorrect, isn't it? No, not as incorrect. I think it's a different way of describing what that frame of reference is. I mean, it'd be a different way. Well, it may be different, but you're using a term that's just, you know, came out of, I don't know where it came from. Sure. I think it was meant as really a synonym for gravity. Gravity is relative to the earth because it's a force from the center of the earth. Okay, that I understand. Yeah, yeah. But you're using a term that's just not in the record. That's not, that's, that's. But it's the exact same concept because the inertial frame or gravity frame, you have three axes. One is the gravity, which is perpendicular to the surface of the earth. Then you have the two other axes that, you know, give you the motion, basically. And so that earth frame is the same thing as the gravity frame, as what's being talked about in these patents here. Now, one point, if I might add, the claims nowhere talk about sensing a field or sensing gravity or anything like that. And so what the board did was they defined the frame with respect to what this device was doing, which is, okay, I need to align with the frame of the screen. And as you pointed out, all those drawings show the screen as being vertical. And so that essentially is the same as the gravity axis or the earth frame. Well, you have figure three and the screen in that figure is not vertical. Yes, but that's a different embodiment of E-Day. Okay. And everyone agrees that that one is clearly tilted. It's depicted as tilted. But when you look at the other figures, I think it was 33 and then 35 with the big boxy TVs, those are essentially vertical. One other point I'd like to make, the claim construction proposed by Hillcrest talks about this external field and gravity, but when you read the 118 patent carefully, yeah, they talk about using accelerometers and the like, but they also talk about using different types of sensors that have nothing to do with fields like gravity. If you look at, for example, column 16, line 44, this is at page 47 in the appendix, column 16, line 44, they list a number of types of sensors. Accelerometers are one of them. They also list cameras as being a type of sensor you could use to implement this invention. I don't think I know of any camera that senses gravity. Yeah, cameras that sense the angle of the horizon. But that's not sensing gravity. I mean, if you talk about a conventional camera, that's a visual image. Could be. I mean, you asked me, and I'm the wrong person to ask. Okay. I was just expressing my own... So was I, but let's not do that. The additional point I want to make is that throughout the prosecution, from the original prosecution to the re-exam, the terms inertial frame and user frame were essentially used interchangeably. Going back to the notice of allowability from the original examiner, they treated the two terms essentially the same. Hillcrest and its argumentation treats them the same. And the $64 question is, if these terms are so significant yet so different, why wouldn't Hillcrest have really helped themselves out by giving us a clear definition and a clear demarcation in the patent? User frame is this. Inertial frame is that. Okay. Do you want to conclude? You're out of time. I'm out of time. I appreciate your indulgence. Thank you. Thank you. Counselor Barney, we restore you to four minutes before we go. Thank you, Your Honor. Just a few points. With respect to the E-Day reference, if I could refer the court to Appendix 746. This goes to the rotational question about whether or not the correction equation uses linear sensor outputs or rotational sensor outputs. And, Your Honor, I do see. Is this what you're showing us? Yes, Your Honor. Well, I mean, this is the whole problem with this case. I mean, I don't know about my colleagues, but I don't have this kind of background to understand what this is going to say. And so you're going to tell me one thing. He would have probably told me the other thing. I've got the board saying one thing. How do I find a lack of substantial evidence for this? Well, I appreciate what you're saying, Your Honor. Why don't you address the parts that he showed me about where the examiner talked about these rotational outputs and things like that in the board's decision. So, I mean, you can go ahead and do this. But, like I said, if you want me to understand this chart, I'm either going to have to take your word for it or not. I don't think anything you're going to say about it is going to convince me of some objective truth about what this says. Okay. Well, let me just take a step back then and hopefully I'll address your concerns. Let me ask you this question, too. Yes, Your Honor. So, your opponent went asking about the earth frame. He says, well, there's no earth frame involved, but it's gravity frame. And he explained to me that the gravitational forces of earth. Is the term gravity frame used anywhere? No, Your Honor. The only terms that are used in the patent are inertial frame of reference and user frame of reference. And, Judge Hughes, you did correctly state the issue here, which is that in E-Day there is no way to sense the screen and, therefore, there is no way to automatically rotate into that screen's frame of reference. The only way it can be done is to manually align the device to the screen and then, from that point forward, and there has to be some sort of button or way to tell the device this is now the frame of reference I want you to rotate into. There are six embodiments in E-Day. The first three don't use rotation at all. There's no correction at all. And those are the cursor embodiments. And so the first three embodiments of E-Day have a cursor on a screen and they don't have any way to compensate for tilt. The tilt compensation comes in in the fourth embodiment, which is dealing with gesture recognition. What the examiner tried to do is to say, well, I'm going to take just that rotation correction circuit and the rotation correction equation and I'm going to graph that onto a cursor control type of embodiment, which is fine. But when you do that, you have to take the entire circuit and the entire equation. And what that requires is a setting to tell the device, here is the frame of reference that I want to use. And you put your finger on it exactly. It's the difference between automatic correction, which is what an inertial frame of reference will do for you, and a manual correction. That is the difference between a user frame of reference and an inertial frame of reference. So let me, I'm getting there a little bit more. I mean, you're being much more helpful than you were in the brief. So it's what you're saying is your device, you turn it on and because it has these rotational sensors and not just a gyroscope or whatever that E-Day shows, it knows which way is down automatically. And the screen is down. I mean, I assume we can pose hypotheticals about a screen being like this and this, but that's not what we're really talking about. People don't work with screens that are sideways or something like that. I mean, maybe there's a cell or something. So your device knows what is down. And E-Day, yeah, yeah. And so E-Day doesn't show what's down. Except that the examiner, didn't the examiner find that it would be inherent to use an accelerometer with E-Day? No, Your Honor. The board did not find it was inherent. The board found. I didn't say the board. The examiner didn't find that it was inherent. The examiner found it was obvious to replace a rotation sensor, which is rotating, and replace it with an accelerometer for detecting relative rotation. Not for detecting tilt relative to gravity. It was a one-for-one replacement. So once you do that replacement, you're still detecting relative. But an accelerometer knows what down is. But the replacement that the board found would be obvious was not to replace it with an accelerometer that measures tilt relative to absolute value and then uses that in the rotation equation. That would be an additional step of logic and technology that the examiner did not find. And the board certainly didn't find that. And so I think you basically boiled it down correctly. It's the difference between automatic correction versus having to do it manually. That's the difference between the two frames of reference. And we would submit that the examiner did not use, the correct construction. He basically equated those two. Okay. We got your argument. Thank you very much. Thank you.